## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH A. MCQUAID,** both<br>Individually and as the Administrator<br>of the ESTATE OF<br>DOMINIC INGLE<br>227 Tennyson Drive<br>Lancaster, PA 17602 | :<br>:<br>:<br>:<br>:<br>:<br>: | |
| **Plaintiff** | :<br>: | **Civil Action No.** |
| **v.** | :<br>: | |
| **JOHN WETZEL**<br>Secretary of Corrections<br>1920 Technology Parkway<br>Mechanicsburg, PA 17050 | :<br>:<br>:<br>: | |
| and | :<br>:<br>: | |
| **LAUREL HARRY**<br>SCI- Camp Hill, Superintendent<br>c/o Department of Corrections<br>1920 Technology Parkway<br>Mechanicsburg, PA 17050 | :<br>:<br>:<br>:<br>: | **JURY TRIAL DEMANDED** |
| and | :<br>:<br>: | |
| **CORRECTIONAL OFFICER**<br>**SERGEANT FLETCHER**<br>c/o Department of Corrections<br>1920 Technology Parkway<br>Mechanicsburg, PA 17050 | :<br>:<br>:<br>:<br>: | |
| and | :<br>: | |

1

**CORRECTIONAL OFFICERS**              :
**JOHN/JANE DOES (1-10)**              :
**(fictitious)**                       :
c/o Department of Corrections          :
1920 Technology Parkway                :
Mechanicsburg, PA 17050                :
                                       :
and                                    :
                                       :
**SPECIALIST KRISTIE GERSON**          :
c/o Department of Corrections          :
1920 Technology Parkway                :
Mechanicsburg, PA 17050                :
                                       :
and                                    :
                                       :
**SPECIALIST ROBERT WIMER**            :
c/o Department of Corrections          :
1920 Technology Parkway                :
Mechanicsburg, PA 17050                :
                                       :
and                                    :
                                       :
**NURSE PRACTITIONER**                 :
**KEVIN WANGA**                        :
c/o Department of Corrections          :
1920 Technology Parkway                :
Mechanicsburg, PA 17050                :
                                       :
and                                    :
                                       :
**DR. SAIQA MUSHTAQ, MD**              :
c/o Department of Corrections          :
1920 Technology Parkway                :
Mechanicsburg, PA 17050                :
                                       :
and                                    :

2

**MHM CORRECTIONAL**                 :
**SERVICES, LLC**                    :
**d/b/a MHM SOLUTIONS**              :
1593 Spring Hill Rd., Suite 600      :
Vienna, VA 22182                     :
                                     :
and                                  :
                                     :
**CORRECT CARE SOLUTIONS,**          :
**LLC n/k/a WELLPATH, LLC**          :
1283 Murfreesboro Rd., Suite 500     :
Nashville, TN 37217                  :
                                     :
and                                  :
                                     :
**MEDICAL PROVIDERS**                :
**JOHN/JANE DOES (1-10)**            :
**(fictitious)**                     :
                        Defendants : 

## COMPLAINT

Plaintiff, Joseph A. McQuaid, as Administrator of the Estate of his deceased son, Dominic Ingle, for his civil action against Defendants named above, does hereby aver as follows:

### NATURE OF THE ACTION

1.     On December 4, 2019, Dominic Ingle, age 24, hanged himself in his cell at the State Correctional Institution in Camp Hill, Pennsylvania ("SCI- Camp Hill").  He died 11 days later from his injuries.

2.     Mr. Ingle's actions were the culmination of his struggle with mental illness which was well-documented and well known within the Pennsylvania

Department of Corrections ("DOC") system, specifically at SCI-Camp Hill, where Mr. Ingle had been for several weeks prior to his suicide.

3.      Unfortunately, the administrators, staff, correctional officers, and medical personnel at SCI-Camp Hill all ignored the obvious signs and warnings about Mr. Ingle's cries for help and desperate need for mental health treatment and merely locked him away in a prison cell, knowing full well that he not only wanted to take his own life but was planning to do so at the earliest possible opportunity.

4.      The administrators, staff, correctional officers, and medical personnel at SCI-Camp Hill, as well as the leader of the DOC, all breached their duties to protect Mr. Ingle and allowed him to commit suicide like so many other inmates with serious mental illnesses had previously done at that prison, and others in the Pennsylvania State Prison system, as the Defendants lacked the proper training and desire to protect and assist those who needed their help.

**THE PARTIES**

5.      Plaintiff Joseph A. McQuaid is an adult individual and citizen of the Commonwealth of Pennsylvania who resides at 227 Tennyson Drive, in the City and County of Lancaster.

6.      On February 11, 2020, Plaintiff was granted Letters of Administration by the Register of Wills of Lancaster County, Pennsylvania to act as the Administrator of the Estate of Dominic Ingle, his deceased biological son.

7.      Mr. Ingle was born on December 28,1994 and hanged himself on December 4, 2019, at SCI-Camp Hill, where he was an inmate.  SCI-Camp Hill is located in in Cumberland County, Pennsylvania.  Mr. Ingle died from his injuries sustained in the hanging on December 15, 2019, at Geisinger Holy Spirit Medical Center.  At age 24, he was survived only by his biological father, Plaintiff Joseph A. McQuaid.

8.      Defendant John Wetzel ("Sec. Wetzel") was, at all relevant times, the Secretary of the Pennsylvania Department of Corrections ("DOC"), acting under color of law and within the course and scope of his employment with the Commonwealth, with a principal place of business at 1920 Technology Parkway, Mechanicsburg, Pennsylvania.

9.      Defendant Laurel Harry ("Sup. Harry") was, at relevant times, the Superintendent of SCI-Camp Hill, acting under color of law and within the course and scope of his employment with the Commonwealth, with a principal place of business at 2500 Lisburn Road, Camp Hill, Pennsylvania.

10.     Defendant Correctional Officer Sergeant Fletcher ("Sgt. Fletcher"), first name unknown, was, at all relevant times, a correctional officer with the rank of Sergeant employed by the DOC working at SCI-Camp Hill, acting under color of law and within the course and scope of his employment with the

Commonwealth, with a principal place of business at 2500 Lisburn Road, Camp Hill, Pennsylvania.

11.    Defendant Correctional Officers John/Jane Doe (1-10) were correctional officers or supervisors employed by the DOC working at SCI-Camp Hill, acting under color of law and within the course and scope of his/her employment with the Commonwealth, with a principal place of business at 2500 Lisburn Road, Camp Hill, Pennsylvania.  Records obtained by Plaintiff pertaining to Mr. Ingle's incarceration at SCI-Camp Hill from October-December 2019 do not contain the name(s) of the correctional officer(s) who were responsible for overseeing Mr. Ingle, during that time.  Plaintiff expects to learn the name(s) of the additional correctional officer(s) and/or supervisor(s) through formal discovery and will promptly take stapes to substitute the actual names of those persons for the fictitious names.[1]

12.    Defendant Specialist Kristie Gerson ("Specialist Gerson") was, at all relevant times a psychological services specialist working at SCI-Camp Hill, acting under color of state law and within the course and scope of her employment with the Commonwealth of Pennsylvania, Defendant MHM Correctional Services, LLC ("MHM"), and/or Correct Care Solutions, LLC ("CCS").

---

[1] Defendants Sec. Wetzel, Sup. Harry, Sgt. Fletcher, and Correctional Officers John/Jane Doe (1-10) are hereinafter collectively referred to as the "DOC Defendants."

13.    Defendant Specialist Robert Wimer ("Specialist Wimer") was, at all relevant times a psychological services specialist working at SCI-Camp Hill, acting under color of state law and within the course and scope of his employment with the Commonwealth of Pennsylvania, MHM, and/or CCS.

14.    Defendant Nurse Practitioner Kevin Wanga, CRNP ("NP Wanga") was, at all relevant times a certified registered nurse practitioner registered in the Commonwealth of Pennsylvania working at SCI- Camp Hill, acting under color of state law and within the course and scope of his employment with the Commonwealth of Pennsylvania, MHM, and/or CCS.

15.    Defendant Dr. Saiqa Mushtaq, M.D. ("Dr. Mushtaq") was, at all relevant times a medical doctor registered in the Commonwealth of Pennsylvania to practice medicine working at SCI- Camp Hill, acting under color of state law and within the course and scope of his employment with the Commonwealth of Pennsylvania, MHM, and/or CCS.

16.    Defendant MHM Correctional Services, LLC d/b/a MHM Solutions ("MHM") is an active foreign limited liability company registered to do business in the Commonwealth of Pennsylvania with a principal place of business at 1593 Spring Hill Road, Vienna, Virginia.  At all relevant times, MHM was under contract with the DOC to provide psychiatric and mental health services to inmates at the Pennsylvania State Prisons, including Ingle at SCI-Camp Hill.

17.    Defendant Correct Care Solutions, LLC n/k/a Wellpath, LLC ("CCS") is an active foreign limited liability company registered to do business in the Commonwealth of Pennsylvania with a principal place of business at 1283 Murfreesboro Rd., Nashville, Tennessee.  At all relevant times, CCS was under contract with the DOC to provide health care services to inmates at the Pennsylvania State Prisons, including Ingle at SCI-Camp Hill.

18.    Defendant Medical Providers John/Jane Doe (1-10) were doctors, nurses, specialists or other medical or mental health care providers working at SCI-Camp Hill and as employees of the DOC, MHM, and/or CCS. Records obtained by Plaintiff pertaining to Mr. Ingle's incarceration and medical treatment at SCI-Camp Hill from October-December 2019 do not contain the name(s) of all of the medical and health care providers(s) who were responsible for providing medical and/or mental health care to Mr. Ingle during that time.  Plaintiff expects to learn the name(s) of the additional doctors, nurses, specialists or other medical or mental health care providers through formal discovery and will promptly take stapes to substitute the actual names of those persons for the fictitious names.[2]

19.    At all relevant times, MHM and CCS were acting, or alternatively, failed to act, by and through their employees, agents, and/or ostensible agents, who

---

[2] Defendants Spec. Gerson, Spec. Wimer, NP Wanga, Dr. Mushtaq, MHM, CCS, and Medical Providers John/Jane Doe (1-10) are hereinafter collectively referred to as the "Medical Defendants."

were acting within the course and scope of their employment, agency, and/or ostensible agency.

## JURSIDICTION AND VENUE

20.     This Court has jurisdiction of this action over all Defendants pursuant to 42 U.S.C. § 1983, as well as 28 U.S.C. § 1331.  This Court has jurisdiction over the pendant state tort law claims pursuant to 28 U.S.C. § 1367 (a).

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a substantial part of the events and/or omissions giving rise to Plaintiff's claims took place at SCI-Camp Hill, in Camp Hill, Pennsylvania, within the Middle District of Pennsylvania.

## FACTUAL BACKGROUND

### *DOC's History of Failing Inmates with Mental Illnesses*

22.     The Pennsylvania State Prison system has a long history of failing its inmates who suffer from serious mental illnesses, especially those who seek to do harm to themselves.

23.     In March 2013, a lawsuit was filed in this Court at 1:13-cv-00635 by the Disability Rights Network ("DRN"), a group charged by the Commonwealth of Pennsylvania to protect citizens with mental illness, against DOC Secretary John Wetzel.  The DRN lawsuit claimed that the DOC was violating the Eighth Amendment rights of inmates with mental illnesses by not providing them

adequate mental health care and treatment which had led to inmates not only being deprived of that care and treatment but also an increase in inmate suicides. A copy of the Complaint ("DRN Complaint") in that matter is attached hereto as Exhibit "A."

24.    The DRN Complaint alleged that 22% of the DOC inmate population, approximately 11,000 inmates, were designated as having a serious mental illness. Exhibit "A" at ¶ 15.

25.    The DRN lawsuit arose from an infamous DOJ investigation of the treatment of inmates at SCI-Cresson who were afflicted with serious mental illnesses. That investigation led to a report in May 2013 that detailed how SCI-Cresson used isolation on inmates with mental illnesses, failed to provide adequate mental health care, and had systematic deficiencies that failed those prisoners who were most in need on mental health treatment and care. A copy of the May 31, 2013 report of the DOJ investigation of SCI-Cresson is attached hereto as Exhibit "B."

26.    The May 31, 2013 DOJ report also pointed to concerns that the issues were not unique to SCI-Cresson, which subsequently closed as a prison facility, but that the issues identified by the DOJ investigation may have been common amongst the other state prisons under the DOC. The May 31, 2013 report led to a further statewide investigation by DOJ that culminated in a February 2014 letter

report to the Governor of Pennsylvania outlining the systemwide issues that existed in the DOC prisons.  A copy of the February 24, 2014 letter report of the DOJ investigation of the DOC is attached hereto as Exhibit "C."

27.    In essence, the DOJ found that many of the issues that existed at SCI-Cresson also existed at the other prisons, suggesting policies that ran systemwide that discriminated against and seriously harmed inmates with serious mental illnesses.  *See* Exhibit "C," generally.

28.    DOJ recommended "minimal remedial measures" to provide "constitutionally adequate mental health care" to inmates in the Pennsylvania State Prison system.  Included in those measures were requirements that DOC take steps to protect inmates from "suicide, suicide attempts, and self-harm," such as requiring training for DOC staff members regarding responses to and documentation of suicide attempts or self-harm.  *Id.*

29.    The DOC, and Sec. Wetzel, vowed to change their ways and for a time, it appeared that steps had been taken to improve conditions for inmates with serious mental illnesses and lower suicide rates within the state prisons.

30.    However, any such measures that were implemented were ineffective and did not last.

### *DOC's Well-Known History of Inmate Suicides and Attempts*

31.    Suicides in the PA state prisons have again been on the rise for years and are recognized widely as a significant issue.

32.    According to statistics kept by the DOC, there were 8 inmate suicides in the state prisons in 2015, 7 of which were by hanging.  In 2016, there were 10 inmate suicides, all by hanging.  In 2017, there were 14 inmate suicides, 11 of which were by hanging.  In 2018, there were 15 inmate suicides, 14 of which were by hanging.  And in 2019, the year Ingle killed himself by hanging, there were 18 inmate suicides BEFORE Ingle hanged himself on December 4, 2019, 17 of which were by hanging- over twice the number of annual suicides in the DOC from just 4 years prior.

33.    In 2019 alone, and prior to Ingle's suicide, two other inmates at SCI-Camp Hill killed themselves by hanging in January and June 2019.

34.    At the time of those suicides, and when Ingle ultimately hanged himself in his cell on December 4, 2019, Sup. Harry was the Superintendent of SCI-Camp Hill.

35.    According to an article published in *The Philadelphia Inquirer* dated October 9, 2018, entitled *Why are so many Pa. prison inmates committing suicide?*, the rate of suicide between 2008 and 2018 had nearly doubled, and

inmate suicide attempts had more than tripled from 2014 (181) and 2018 (551).  A copy of the October 9, 2018 article is attached hereto as Exhibit "D."

36.    According to that same article, while the suicide rate among the general population had risen by 22 percent between 2008 and 2017, over the same ten-year span, the suicide rate in Pennsylvania prisons had grown by <u>103</u> percent- ***almost five (5) times*** as much as for the general population.

37.    While the DOC had dealt with high suicide rates before in the 1980s, the problem has intensified sharply in recent years.  In 2018, DOC Secretary Wetzel, who is still in charge of the DOC, declared a "suicide cluster" after 5 inmates at SCI-Graterford killed themselves in three months.  As a result, the DOC recognized the increasing suicide problem in its prisons and went about reviewing its then-existing policies and practices.

38.    However, as of December 4, 2019, over a year after DOC Secretary Wetzel had recognized the issues with increasing numbers of suicides in the PA state prisons, no significant changes had been made to combat the growing numbers of inmates who attempted to and ultimately did take their own lives.

39.    Ingle's suicide in December 2019 was not an anomaly, but was part of an ongoing, systemic breakdown that has continually failed those with serious mental illnesses within the Pennsylvania State Prison system.

### *Ingle's First Stay in State Prison*

40.    Dominic Ingle had a long and well-documented mental health history when he first became an inmate in the Pennsylvania State Prison System in 2017. He had been institutionalized either in mental health facilities, juvenile detention, or county prison for much of his young life prior to being sent to state prison for the first time in March 2017 for a 3–6-year sentence for aggravated assault.

41.    Prior to his incarceration in state prison, Ingle was an abuser of drugs, including heroin and K2, which was also known and documented in his DOC files.

42.    In March 2017, Ingle came to SCI-Camp Hill, where the DOC records indicate that the DOC was aware of his prior mental health issues, including depression, substance abuse, and suicidal ideations, including a suicide attempt by cutting of his wrists in 2006.  The DOC was also aware that Ingle was prescribed Risperdal, which is an antipsychotic used to treat mood disorders such as schizophrenia, and Sinequan, which is an antidepressant used to treat depression.

43.    Ingle's incarceration at SCI-Camp Hill in March 2017 was his first taste of state prison, where the inmates are generally sentenced to longer sentences for more serious crimes than those he had encountered in his earlier institutionalizations.

44.    At SCI-Camp Hill, Ingle met with and was given a mental health assessment by Defendant NP Wanga on or about March 25, 2017, where he was

diagnosed with the following mental health disorders: bipolar disorder, depression, antisocial disorder, unspecified disruptive and impulse control disorder, and severe opioid disorder.  NP Wanga prescribed Risperdal for Ingle's impulsivity and Doxepin, an antidepressant for Ingle's depressive symptoms.

45.    The medical and mental health staff within the DOC at that time were well aware of Ingle's mental health issues, including prior suicide attempt, substance abuse, hospitalizations, and treatments which they documented in his DOC records.

46.    From SCI-Camp Hill, Ingle was transferred to Quehanna Boot Camp from approximately the month of June 2017. While at Quehanna it was noted in the DOC records that Ingle's blood tests were negative for Doxepin, which led them to believe he was not taking his medication.

47.    At the end of June 2017, Ingle was transferred to SCI-Houtzdale where he resided in general population, despite his noted history of mental health issues and suicidal ideation and attempt when he was a young teenager.

48.    Shortly after coming to SCI-Houtzdale, and with the full awareness of the staff at the prison, as it was noted in the DOC records, Ingle discontinued taking the antipsychotic and antidepressant medications he had been prescribed.

49.    During his time at SCI-Houtzdale in 2017 and 2018, Ingle began to suffer from debilitating abdominal pain and gastrointestinal issues, which

necessitated numerous visits to the infirmary.  He was given medication to treat what was believed to be IBS.  His severe abdominal pain and gastrointestinal issues continued on a chronic basis for over a year.

50.   However, in the Fall of 2018, while Ingle was imprisoned at SCI-Houtzdale, his mother, his closest relative, and the person who raised him, died of a heroin overdose, which triggered Ingle's mental health issues again.

51.   Ingle described his emotions to the DOC mental health staff which were recorded in the DOC records on October 29, 2018.  Ingle told the mental health staff that he was "experiencing a lot of stress and anxiety and its [sic] just getting worse."  It was further reported that Ingle was feeling paranoid, his heart was racing, his palms were sweating, he was fidgeting, and he was unable to focus. He was referred to Psychiatry that day.

52.   However, it was not until December 3, 2018, over a month after his referral, that Ingle finally saw a psychiatrist at SCI-Houtzdale who had a brief encounter with Ingle and determined that he was suffering from social anxiety disorder and prescribed Zoloft, an antidepressant often used to treat anxiety.

53.   After just a few days on the medication, Ingle took himself off of the Zoloft and refused to attend group therapy, deciding to deal with his issues alone.

54.   Eventually, Ingle was paroled from SCI-Houtzdale on or about August 20, 2019.

55.     However, it was barely two months before Ingle's mental health issues caused him to be sent back to state prison as a parole violator.

### *Ingle's Parole Violation and Return to State Prison*

56.     On October 21, 2019, Ingle was again at SCI-Camp Hill as an inmate when he was sent there as a parole violator by his parole officer.  Ingle was accused of abusing his girlfriend, Brandi Knapp (aka Bailey Raen, Bailey Hayes, Brandi McKinney, and Brittany Godfrey), which was a potential direct violation of his parole.

57.     On information and belief, upon the arrest of Ingle for the alleged assault of Ms. Knapp, the court issued a "no-contact order" or "stay-away order" between Ingle and Ms. Knapp.

58.     Ingle was sent to SCI-Camp Hill after he had been hospitalized at York Hospital from approximately October 14-21, 2019, because he tried to commit suicide by stabbing himself with a knife in his stomach and neck.  While in the hospital, he needed an exploratory laparotomy of his abdomen to make sure he hadn't damaged any major organs, which left him with a large, healing, and painful incision in his abdomen when he arrived at SCI-Camp Hill on or about October 21, 2019.

59.     Upon admission to SCI-Camp Hill, Ingle was assessed by a nurse, approved by NP Wanga, who determined that due to Ingle's suicide attempt that

preceded his return to incarceration at SCI-Camp Hill, Ingle was first to be housed in a personal observation cell ("POC") at SCI-Camp Hill, where he was alone in a cell and could be observed to make sure he didn't try to harm himself again. He was placed on a 10-minute close watch, which meant that he was to be monitored on a regular basis, but at least every 10 minutes. Ingle was permitted to have only a mattress, an anti-suicide smock, Styrofoam cups and tray, and no utensils.

60. On October 22, 2019, Ingle was first seen by Psychiatry at SCI-Camp Hill, in the form of Defendants Dr. Mushtaq and Spec. Wimer who reported that they were assessing Ingle because he had 2 recent incidents of "self-harm," an overdose and self-stabbing. Ingle reportedly told them that he had no recollection of stabbing himself as he had taken a combination of alcohol and Xanax to treat his anxiety. He claimed that he didn't have suicidal thoughts "on a regular basis."

61. Dr. Mushtaq and Spec. Wimer decided that despite his very recent self-stabbing, since Ingle denied trying to harm himself and did not express any current ideation or plans to kill himself, he should be stepped down to the Special Observation Unit ("SOU").

62. Based on DOC's own policies, procedures, and criteria, Ingle should not have been approved to be stepped down at that point, as he was still at a high suicide risk. The DOC's Access to Mental Health Care Procedures Manual, 13.8.1, Section 2- Delivery of Mental Health Services states:

Suicide and self-injurious acts are serious dangers in any correctional setting.  Therefore, early identification, appropriate housing and monitoring, and proper treatment of a potentially self-destructive inmate is critically important, both for the individual in need of service and for the facility charged with his her/ care.

1. Assessment of Suicide Risk
   Suicide potential can be evaluated by using the criteria listed below.  These criteria are intended to help staff formulate a plan of prevention and treatment.
   a. Suicidal Plan…
   b. Prior Suicidal Behavior…
   c. Stress…
      (1)  difficulties in coping with legal problems.
      (2)  the loss of a loved one through death or divorce…
      (9)  unexpected punishment (misconducts or additional sentence;
      (10) cell restriction…
      (12) recently returned to prison due to a parole violation;
      (16) history of violence toward others;
      (17) low IQ…
      (20) long sentence…
      (21) history of alcohol and/or drug abuse

63.    It was or should have been well known to the DOC mental health staff that Ingle was violated by his parole officer because he allegedly hurt or threatened to hurt his girlfriend, Ms. Knapp, whom he also called his fiancée.

64.    Ingle was thus faced with losing his freedom, his home, and his fiancée, along with his lengthy and well-documented mental health issues, including suicidal ideation and a prior attempt, Ingle had just stabbed himself in the stomach in an apparent attempt to kill himself in an extremely painful manner.

19

65.     Nevertheless, within two (2) days, on or before October 24, 2019, and based on the recommendation of Dr. Mushtaq and Spec. Wimer, Ingle was reassigned to the SOU.  In the SOU, he was no longer in a cell by himself all day but could move around and socialize with other inmates with mental health issues while also being monitored and treated by DOC mental health providers.  In the SOU, Ingle was monitored at a lower level than when he was in the POC, where he had been constantly monitored by DOC staff.

66.     Two days after admission on October 24, 2019, while in the SOU and in another visit with Spec. Wimer and Dr. Mushtaq, Ingle admitted that he had not been truthful to them in his version of events about what happened when he stabbed himself in the stomach.  Ingle told them that not only was he "completely sober" when he stabbed himself and not under the influence of alcohol and Xanax as he had previously claimed, but that he had also cut his wrist in mid-September 2019, which led to him being involuntarily committed to York Hospital for psychiatric treatment from September 27-30, 2019.  He became tearful when he told this to Spec. Wimer and Dr. Mushtaq.  He further told them that he was feeling "overwhelmed," "hopeless," "doomed," and "trapped in his situation" before both of the two (2) recent suicide attempts.

67.     Thus, Ingle had revealed to Spec. Wimer and Dr. Mushtaq that not only was his most recent suicide attempt not an "accident" but was actually a more

20

serious effort that was part of a pattern of suicide attempts that had led to his involuntary commitment for psychiatric treatment. All of this was documented by both Dr. Mushtaq and Spec. Wimer in the DOC records.

68. Dr. Mushtaq determined that Ingle was suffering from major depressive disorder but did not determine that Ingle was still a danger to himself, despite the revelations about his recent suicide attempts and involuntary commitment for psychiatric treatment.

69. Despite these new revelations by Ingle to Dr. Mushtaq and Spec. Wimer, they did not re-assess his suicide risk, increase his supervision level, and/or transfer him back to a POC, where he could be monitored and treated until he was no longer a suicide risk.

70. Instead, Dr. Mushtaq chose to treat Ingle's severe depression and mental illness with more medication. On October 24, 2019, Dr. Mushtaq prescribed Ingle aripiprazole ("Abilify") to add to the previously prescribed divalproex, to combat Ingle's depression, bipolar disorder, and manic episodes which led to his very recent suicide attempts in September and October 2019. Abilify is a medication which may be used as an "add-on" when normal antidepressants are not enough on their own.

71. Dr. Mushtaq and Spec. Wimer should have been aware that while previously in DOC facilities, Ingle had previously chosen to go off his prescribed

meds, as it was well-documented in Ingle's DOC mental health records, for which they had access, and which they both should have reviewed in their respective assessment and treatment of Ingle.

72.    On October 28, 2019, Ingle was still housed in SCI-Camp Hill's SOU and was seen by Spec. Wimer, who noted in the DOC records that Ingle stated he felt better and that his mood was not fluctuating as much since he started the Abilify.  At that time, Ingle asked to be discharged from the SOU.

73.    On or about October 29, 2019, a Psychiatric Review Team ("PRT"), consisting of Psychiatrist Dr. Mushtaq, Psychology Staff Specialist Wimer, and others from DOC determined that Ingle was doing well enough to discharge him from SOU because he had not made any threats or taken any action to hurt himself and his mood seemed improved after going on Abilify.  However, the PRT failed to consider that Ingle had lied to them when he was first assessed when he: (1) tried to hide his previous suicide attempt in September 2019; (2) misled them that the self-stabbing was an accident, when in fact he later admitted he did it on purpose; and (3) claimed he didn't remember the most recent suicide attempt because he was on drugs and alcohol, which he later admitted was untrue.

74.    As a result, Ingle was discharged from the SOU and assigned to the Residential Treatment Unit ("RTU") where he shared a private cell with another inmate.  Ingle was not under constant monitoring while in the RTU.

75.    When he arrived in the RTU, he was often in contact with Defendant Spec. Gerson, under the supervision of CRNP Wanga.  However, his mental health care and treatment was still managed and overseen by Dr. Mushtaq, who he continued to see and receive medication from while in the RTU.

76.    Around the same time that he was transferred from the SOU to the RTU, Ingle asked if he could have the Abilify administration moved from the daytime to the evening before bed, because he claimed it made him groggy.  Dr. Mushtaq agreed to have the Abilify administration moved to the evening.

77.    On November 12, 2019, Spec. Gerson met with Ingle and reported that Ingle was feeling "more depressed" since starting Abilify and wanted to change his meds.  He reportedly told Spec. Gerson that he was no longer angry but was "really depressed."  Spec. Gerson reported that she emailed both Dr. Mushtaq and NP Wanga about Ingle's "medication concerns."

78.    Dr. Mushtaq approved the change in medication timing without seeing or speaking to Ingle.

79.    On November 18, 2019, six (6) days after Spec. Gerson informed him of Ingle's latest concerns, NP Wanga met with Ingle out of the RTU in NP Wanga's office area.  This was the first (and last) meeting between NP Wanga and Ingle during his 2019 incarceration at SCI-Camp Hill.  During the meeting, NP Wanga reported that Ingle claimed "he cut himself on his stomach and neck"

23

before he was brought back to prison and that he did not remember much of what happened when he cut himself because he was on Xanax, changing his story again about his most recent suicide attempt.  NP Wanga also reported that Ingle was told by his probation officer ("PO") that Ingle had to move out of the house with his fiancée because of an allegation that he abused his fiancée and that he also lost his job.  That left Ingle with nowhere to go to make money, separated from the woman he loved, and with nowhere to stay.

80.    NP Wanga further reported that Ingle claimed he was "fine" but wanted to increase his Abilify dosage to "make his mood more stable."  NP Wanga then agreed to double the dosage of Abilify for Ingle from 5 mg to 10 mg.

81.    Ingle was never again seen by a medical professional from psychiatry at SCI-Camp Hill.

### *Ingle's First Suicide Attempt in Prison is Ignored*

82.    On November 25, 2019, Spec. Gerson met with Ingle after Ingle's cellmate reported to Spec. Gerson that Ingle had told his cellmate that he tried to commit suicide the week before by tying a sheet to the ceiling and hanging himself, but the sheet broke and fell to the floor where he laid "passed out."  The cellmate also reported that Ingle had been cutting his arm.  The cellmate further reported that he told Defendant Sgt. Fletcher about the incident and that Sgt. Fletcher found the tied-up sheets under Ingle's mattress and took them.  Ingle's

cellmate also reported to Spec. Gerson that the sergeant on duty asked the cellmate

where Ingle was, because the sergeant had been told by his lieutenant that Ingle

had been in an argument on the phone with his girlfriend, and that the lieutenant

had received a call from Ingle's girlfriend to say that Ingle was suicidal.  Ingle's

cellmate confirmed that Ingle was often on the phone with his girlfriend and would

kick and punch the wall when he was on the phone with her.

83.     Neither Sgt. Fletcher nor any correctional officer reported the incident

of Ingle's cellmate's statements about Ingle's suicide attempt, nor Sgt. Fletcher's

discovery of the sheet Ingle tried to hang himself with, nor the call from Ingle's

girlfriend that he was suicidal to anyone at SCI-Camp Hill's mental health

department, including Spec. Gerson, NP Wanga, or Dr. Mushtaq.

84.     Despite the evidence of Ingle's suicide attempt in his cell, and

knowing full well of his mental health issues and recent suicide attempts, neither

Sgt. Fletcher nor any correctional officer sought an assessment of Ingle's mental

health status or suicide risk, as required under DOC policies and procedures.

85.     There is no indication that Spec. Gerson spoke to Sgt. Fletcher or any

other correctional officer in the RTU to find out what they knew about the incident

described by Ingle's cellmate where Ingle reportedly attempted to hang himself.

86.     Despite the no-contact or stay-away order that had been issued by the

Court after Ingle's most recent arrest that led to his parole violation, DOC allowed

Ingle to make phone calls to and receive letters from Ms. Knapp, the subject of the stay away/ no contact order, whom DOC knew or should have known was also a trigger for Ingle's mental health issues.

87.     Nonetheless, Spec. Gerson was made aware of the incident by Ingle's cellmate.  When Ingle was confronted by Spec. Gerson with what his cellmate had told Spec. Gerson, Ingle told her that the rope of sheets was his "laundry line."  He also claimed he wasn't suicidal and that he had everything to live for because he was getting out of prison in December.  He claimed that the marks on his arm were scars from earlier cuts and not fresh cuts.

88.     While Spec. Gerson wrote that she was concerned about Ingle's "impulsivity" for his actions after his phone call with his girlfriend, she did not seek to step up monitoring on Ingle.  She merely told Sgt. Fletcher and RTU Unit manager Chris Srebro to let her know if there were any more reports of suicidal behaviors by Ingle.  She also did not have anyone from the infirmary look at the marks on his arm to see if they were fresh cuts.

89.     Neither Spec. Gerson nor anyone else from DOC made any efforts to stop contact between Ingle and Ms. Knapp, which was in violation of the Court's stay-away/ no-contact order and which they knew or should have known was a trigger for Ingle's mental health issues.

90.    Spec. Gerson did not request for Ingle to be seen by a doctor or nurse practitioner in psychiatry to evaluate his mood and behavior or whether he was a danger to himself.

### *Ingle's Girlfriend's Warning of November 26, 2019 is Ignored*

91.    On November 28, 2019, Spec. Gerson received a phone call from a woman on the outside who told Spec. Gerson that she was concerned for Ingle's safety and that he might hurt himself.

92.    On information and belief, Spec. Gerson believed that the woman who called her to speak about Ingle was his girlfriend with whom he had a tumultuous history, was the subject of a stay-away/ no-contact order with Ingle, and was a trigger for his mental health issues.

93.    Spec. Gerson went to Ingle's cell and found him doing sit-ups and with a towel on his door signaling he wanted to use the phone.  Ingle claimed that he had been cut off in a call with his girlfriend and she must have thought he hung up on her.  He denied any suicidal thoughts to Spec. Gerson.

94.    Despite his well-documented mental health history, and this being the second time she had been told by someone close to Ingle that he had threatened or attempted to kill himself, Spec. Gerson took no steps to step up Ingle's monitoring for suicidal behavior.

95.    Neither Spec. Gerson nor anyone else from DOC requested that Ingle be evaluated by a doctor or nurse to evaluate his behavior and mood and to determine if he was a danger to himself.

### *Another Red Flag is Missed on December 2, 2019*

96.    On December 2, 2019, Spec. Gerson saw Ingle in his cell block in the RTU where he told her he was "having a bad day."  Ingle was reluctant to talk, but Spec. Gerson persuaded him to share that his relationship with his girlfriend was not healthy, as they both had mental health issues, and that he had tried to hurt himself before to get her attention.  He asked about increasing his dosage of Depakote, which Spec. Gerson said she would discuss with NP Wanga.

97.    Despite his well-documented mental health history, and his most recent complaints of having a bad day and that he previously hurt himself to get his girlfriend's attention, Spec. Gerson took no steps to step up Ingle's monitoring for mental health or suicidal behavior.

98.    Neither Spec. Gerson nor anyone else from DOC requested that Ingle be seen by NP Wanga of Dr. Mushtaq about either adjusting Ingle's medication or meeting with him to do a mental health assessment to see if he was a danger to himself.

### ***Warnings on the Day Ingle Hanged Himself are Ignored***

99.     On December 4, 2019, at approximately 11:30 am, Spec. Gerson received another call from Ingle's girlfriend.  This time she was crying and saying that Ingle was going to kill himself.

100.    Spec. Gerson went to Ingle and told him about the call.  Ingle denied he was suicidal and blamed everything on his girlfriend and their "toxic relationship."  Spec. Gerson allowed Ingle to call the girlfriend, and the first two times she hung up on Ingle.  The 3rd time she wouldn't let him speak and then hung up on him.  Spec. Gerson permitted these calls despite the stay-away/ no-contact order between Ingle and his girlfriend that she knew or should have known about.

101.    Despite his history of recent suicide attempts which he claimed were motivated to get his girlfriend's attention, the reports of his anger when speaking to his girlfriend on the phone, the reports of his very recent suicide attempt in the prison by hanging from the ceiling and the finding of a sheet by Sgt. Fletcher consistent with what Ingle's cellmate had said Ingle used to try to kill himself, Spec. Gerson took no steps to step up Ingle's monitoring for suicidal behavior.

102.    Neither Spec. Gerson nor anyone else from DOC sought a medical referral to psychiatry for Ingle.

103.   Instead, Ingle was allowed to go back to the private cell that he shared with one other inmate that they were both free to walk in and out of for hours at a time.

104.   Despite his well-documented mental health history, prior suicide attempts in and out of prison, and credible reports from his cellmate and his girlfriend that Ingle had tried or was planning to kill himself, no one at SCI-Camp Hill continually monitored what Ingle was doing on December 4, 2019, after his meeting with Spec. Gerson.

### *Ingle Commits Suicide Within Hours of the Latest Warning*

105.   At approximately 4:45 pm that day, approximately five (5) hours after the most recent warning that Ingle was planning to commit suicide, Ingle's cellmate returned to his cell from working elsewhere in the prison to find Ingle hanging by a cord from his neck.

106.   On information and belief, the cord that he hanged himself with came from a laundry bag that had been issued to Ingle by the DOC without any consideration that he might use the cord to harm himself, despite the DOC's knowledge of his serious mental health issues and Ingle's suicidal ideation and recent suicide attempts.

107.   During those intervening five (5) hours, and despite his serious mental health history, multiple and recent suicide attempts, and recent evidence and

warnings that he had tried and was going to kill himself, there is no record that anyone from DOC made any inquiries or took any steps to address Ingle's mental health issues and continuing suicidal ideation and threats.

108.  Ingle was alone in his cell when he hanged himself, with no one from DOC monitoring him to ensure that he did not harm himself.

109.  Ingle was rushed to the hospital but ultimately passed away on December 15, 2019, from the injuries sustained in his suicide attempt of December 4, 2019.

110.  On December 17, 2019, the Cumberland County Coroner's office ruled that the cause of Ingle's death was passive hanging, and the manner of his death was suicide.

111.  It was the negligence and wanton and reckless failures of all of the Defendants, who were charged with protecting and caring for the mental and physical well-being of Dominic Ingle, a seriously mentally-ill inmate in their facility that demonstrated on numerous occasions that he was an immediate threat to himself, that led to Ingle's tragic and preventable suicide.

112.  Plaintiff now seeks recovery from all Defendants for the catastrophic and fatal injuries, damages, and economic losses suffered by Ingle and his family, as more fully described herein and below.

## COUNT I

### *VIOLATION OF DOMINIC INGLE'S FEDERAL CIVIL RIGHTS AS GUARANTEED BY THE EIGHT AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION PURSUANT TO 42 U.S.C. § 1983*

113.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

114.    At all relevant times, Defendants, acting under color of law, were deliberately indifferent to Ingle's serious medical needs in violation of the Eighth Amendment's prohibition of cruel and unusual punishment and the Fourteenth Amendment's rights of due process.

115.    In particular, Defendants were deliberately and recklessly indifferent to Ingle's extreme suicide risk and vulnerability to suicide, which they knew and/or should have known of on or before October 21, 2019 and continuing until December 4, 2019.

116.    During his time at SCI-Camp Hill from October 21, 2019, up until just hours before he hanged himself in his cell on December 4, 2019, Defendants had actual knowledge of Ingle's serious mental illness, history of failed suicide attempts, suicidal ideation, and threats from witnesses with knowledge that Ingle either threatened or attempted to commit suicide while incarcerated at SCI-Camp Hill, all of which were indicative of a high suicide risk, as set forth in DOC's own policies, as set forth herein and above.

117.   Despite such knowledge, Defendants ignored, if not exacerbated, Ingle's obvious suicidal propensities and failed to take necessary and available precautions which would have saved his life, such as housing Ingle in the appropriate unit where he could be monitored and treated; providing the appropriate mental health care, diagnosis and treatment, including medications, counseling, and trained medical and mental health professionals; ensuring that he was observed at all times; providing an anti-suicide smock and blanket; denying him access to the means to hang himself in the form of the cord from a laundry bag; placing him in a cell where he could not hang himself; and otherwise denying him the means to commit suicide.

118.   At the very least, Defendants should have and were obligated to follow the policies and procedures of the DOC regarding the recognition and prevention of suicide, the purpose of which was to protect and enhance the mental health of inmates and to protect them from harming themselves.

119.   Defendants' failure to treat, monitor, and address Ingle's legitimate and serious medical needs transcended contemporary standards of decency, are shocking to the conscience of mankind, and violated his rights under the Eighth Amendment of the United States Constitution to be free from cruel and unusual punishment and his Fourteenth Amendment rights to due process.

120.    Defendants' unreasonable, egregious, malicious, willful, and intentional acts and omissions constitute a deliberate indifference and callous disregard for Ingle's life, safety, and well-being.

121.    As a direct and proximate result of Defendants' unlawful and unconstitutional behavior, Ingle suffered serious bodily harm and death, and Ingle's father, Plaintiff Joseph McQuaid, suffered other catastrophic damages as set forth below.

**WHEREFORE**, Plaintiff demands judgment in his favor against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of Seventy- Five Thousand Dollars ($75,000.00), plus interest, costs, attorney's fees, and other such relief as the Court deems just and proper.

## COUNT II

### *VIOLATION OF DOMINIC INGLE'S CIVIL RIGHTS (MONELL CLAIMS)*

122.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

123.    The violations of Ingle's constitutional rights as forth above were directly and proximately caused by the deliberate indifference of the highest-ranking officials within the DOC and SCI-Camp Hill (Sec. Wetzel and Sup. Harry) and the employers of the medical and mental health care workers (MHM and CCS)

34

to the need for hiring, training, supervision, investigation, monitoring, and/or discipline with respect to the provision of medical and mental health care to inmates such as Ingle, under their custody and control.

124.   The violations of Ingle's constitutional rights as forth above were directly and proximately caused by the encouragement, tolerance, ratification of, and deliberate indifference of those high-ranking prison officials and private mental health and health care contractors to the policies and practices of their agents and employees of refusing, delaying, interfering with, or negligently providing timely and appropriate medical and mental health care and treatment to those in special need like Ingle.

125.   The violations of Ingle's constitutional rights as forth above were directly and proximately caused by the abject failure of these high-ranking prison officials and private mental health and health care contractors, with deliberate indifference, to develop, implement, update, and/or enforce policies and practices to ensure that inmates like Ingle received timely, necessary, and appropriate medical and mental health care for serious mental illness.

126.   On October 21, 2019 and for many days, weeks, months, and years before, these high-ranking prison officials and private mental health and health care contractors knew or should have known of the need to improve and correct failed hiring, training, supervision, investigation, monitoring, discipline, policies,

and practices by virtue of inter alia other suicides of DOC inmates for years, statistics regarding such suicides that were widely known by the high-ranking prison officials and private mental health and health care contractors, and the aforementioned DOJ investigation of SCI-Cresson and the greater DOC, regarding the care of inmates with mental health issues, as alleged above and herein.

127.   The above-referenced failures proximately caused Ingle's serious bodily injury and death, in that they directly and in natural sequence produced, contributed substantially, or enhanced such injuries and death.

128.   The aforementioned acts and/or omissions constitute willful and wanton misconduct in disregard of the rights, health, well-being, and safety of Ingle, to his detriment and that of his father, Plaintiff Joseph McQuaid.

**WHEREFORE**, Plaintiff demands judgment in his favor against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of Seventy- Five Thousand Dollars ($75,000.00), plus interest, costs, attorney's fees, and other such relief as the Court deems just and proper.

## COUNT III

### MEDICAL NEGLIGENCE
### (Under Pennsylvania State Law)
### PLAINTIFF V. MEDICAL DEFENDANTS

129.    Plaintiff incorporates all preceding paragraphs as if set forth more fully herein.

130.    The Medical Defendants were, upon information and belief, licensed to practice medicine in the Commonwealth of Pennsylvania and had a duty to comply with generally accepted medical and mental health standards of care in their medical and mental health care treatment of Ingle.

131.    The injuries, damages, and death of Ingle were caused by the carelessness, negligence, and recklessness of the Medical Defendants, individually and acting by and through their actual or ostensible agents, servants, workmen, and/or employees in the following particular respects:

      a.  failing to timely and accurately recognize, diagnose, and treat Ingle's medical condition, including his serious mental illness;

      b.  failing to timely and accurately diagnose Ingle's behavior as suicidal;

      c.  failing to properly perform a structured suicide risk assessment and reassessment on a timely and accurate basis;

      d.  failing to implement and maintain an intense and appropriate treatment plan to minimize Ingle's risk of suicide;

e. failing to obtain timely and appropriate consultation from specialists, including psychiatrists and psychologists for Ingle's condition;

f. failing to timely and appropriately prescribe and administer necessary medications to Ingle and ensure that Ingle actually took the medications that were prescribed;

g. failing to provide necessary medical information to Ingle about the care he required and providing incomplete and incorrect information to him regarding his care;

h. failing to provide necessary, complete, and correct medical information to other medical professionals caring for ingle about the care he required and/or was provided;

i. failing to timely appreciate the grave danger Ingle was facing and to take seriously his suicidal ideations, attempts, and threats of more attempts;

j. failing to appreciate the signs and symptoms of Ingle's deteriorating mental state that led him to seek to take his own life while in SCI-Camp Hill;

k. failing to prohibit him from access to stressors or triggers for his suicidal tendencies, such as phone calls and letters with his girlfriend/ fiancée;

l. failing to house Ingle in the appropriate housing unit and for the appropriate amount of time;

m. failing to send Ingle back to the SOU or POC when it was obvious that he was suicidal or more likely to be a danger to himself

n. failing to ensure that Ingle was continuously observed when he was housed in the RTU so as to lessen the chance he would hurt himself or attempt to commit suicide;

o. failing to prohibit Ingle from possessing items with which he could hurt himself, such as the laundry bag from which he took the cord to hang himself in his cell;

p. failing to take corrective action on a prompt and appropriate basis when it was reported that Ingle had attempted to hang himself with a bedsheet in his cell;

q. failing to ensure that Ingle possessed an anti-suicide smock and blanket at all relevant times;

r. failing to ensure that others, including supervisors and other medical providers, were timely and appropriately notified when Ingle demonstrated that he had suicidal thoughts, attempted suicide, or others reported that he had expressed that he wanted to commit suicide;

s. failing to follow appropriate suicide related training and policies; and

t. entrusting Ingle's care to individual(s) who they should have known would perform his/her/their duties in a negligent and/or reckless manner.

132. The carelessness and negligence of the Defendants as set forth in the preceding paragraphs of this Complaint were a violation of their duty of care of Ingle, increased the risk of harm and was a direct and proximate cause and substantial factor in bringing about Ingle's serious bodily injury and death.

**WHEREFORE**, Plaintiff demands judgment in his favor against Defendants, jointly and severally, for wrongful death and survival damages, compensatory and punitive damages in an amount in excess of Seventy- Five

Thousand Dollars ($75,000.00), plus interest, costs, attorney's fees, and other such relief as the Court deems just and proper.

## FIRST CAUSE OF ACTION-WRONGFUL DEATH ACTION
## PLAINTIFF V. DEFENDANTS

133.   Plaintiff incorporates the foregoing paragraphs by reference, as if fully set forth at length herein.

134.   Plaintiff brings this action on behalf of all persons entitled by law to recover damages for the death of Ingle pursuant to the Pennsylvania Wrongful Death Act, 42 Pa. C.S.A.§8301.

135.   Plaintiff claims all damages recoverable by law for the wrongful death of  Ingle including, but not limited to, medical expenses, funeral expenses, expenses of administration, and the loss of the care, companionship, comfort, society, services, guidance, nurture, tutelage, and support of Plaintiff's decedent.

**WHEREFORE**, Plaintiff claims of Defendants a sum in excess of Seventy-Five Thousand ($75,000.00) Dollars in compensatory and punitive damages, plus interest, costs, attorney's fees, and other such relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION-SURVIVAL ACTION
## PLAINTIFF V. DEFENDANTS

136.  Plaintiff incorporates the foregoing paragraphs by reference, as if fully set forth at length herein.

137.  Plaintiff brings this action on behalf of the Estate of Dominic Ingle, deceased, pursuant to the Pennsylvania Survival Action, 42 Pa. C.S.A §8302, and claims on behalf of the Estate all the damages recoverable by law including, but not limited to, decedent's pain and suffering and loss of earnings and future earnings capacity.

WHEREFORE, Plaintiff claims of Defendants a sum in excess of Seventy-Five Thousand ($75,000.00) Dollars in compensatory and punitive damages, plus interest, costs, attorney's fees, and other such relief as the Court deems just and proper.

**ZARWIN, BAUM, DeVITO, KAPLAN,
SCHAER & TODDY, P.C.**

**Date:** December 1, 2021          **BY:** *_/s/Peter A. Greiner_____*

**PETER A. GREINER, ESQUIRE**
**Attorney for Plaintiff**