| | | |
|---|---|---|
| JOSEPH A. MCQUAID, | : | |
| Plaintiff | : | No. 4:21-CV-2019 |
| | : | |
| v. | : | **Magistrate Judge Arbuckle** |
| | : | |
| JOHN WETZEL, LAUREL | : | **Electronically Filed Document** |
| HARRY, JOHN/JANE DOES 1-10, | : | |
| SERGEANT FLETCHER, | : | *Complaint Filed 12/01/21* |
| SPECIALIST KRISTIE GERSON, | : | |
| SPECIALIST ROBERT WIMER, | : | |
| NURSE PRACTITIONER KEVIN | : | |
| WANGA, DR. SAIQA MUSHTAQ, | : | |
| MD, MHM CORRECTIONAL | : | |
| SERVICES, LLC, CORRECT | : | |
| CARE SOLUTIONS, LLC *and* | : | |
| JOHN/JANE DOES 1-10, | : | |
| Defendants | : | |

### COMMONWEALTH DEFENDANTS' BRIEF IN SUPPORT OF PARTIAL MOTION TO DISMISS

Defendants John Wetzel and Laurel Harry ("Commonwealth Defendants"), by and through their undersigned counsel, hereby submit this Brief in Support of their Partial Motion to Dismiss, as follows.

## I. STATEMENT OF THE CASE

On December 1, 2021, Plaintiff, Joseph McQuaid, Individually and as the Administrator of the Estate of Dominic Ingle, filed a Complaint against medical providers, as well as several Department of Corrections' (DOC) defendants, in connection with the suicide of Dominic Ingle, an inmate housed at SCI-Camp Hill.

Plaintiff names as Commonwealth Defendants two psychological services specialists and a correctional officer, as well as the Secretary of the DOC, John Wetzel, and the Superintendent of SCI-Camp Hill, Laurel Harry. Count II of the Complaint purports to state a "*Monell* claim" against these supervisory defendants.

Commonwealth Defendants have filed a Partial Motion to Dismiss the *Monell* claim, and all other claims against the supervisory defendants, and now file this brief in support. As explained below, a *Monell* claim is only available against a municipality, and cannot be asserted against the Commonwealth Defendants. The supervisory defendants cannot otherwise be maintained due to lack of personal involvement. For these reasons, and others, all claims against Wetzel and Harry should be dismissed.

## II. QUESTIONS PRESENTED

A. Does Plaintiff's *Monell* claim against Wetzel and Harry fail as a matter of law?

B. Must Wetzel and Harry be dismissed as defendants to the Section 1983 claims due to lack of personal involvement?

C. Are Defendants Wetzel and Harry entitled to qualified immunity?

**[Suggested Answers: YES]**

## III. <u>ARGUMENT</u>

<u>Standard of Review</u>

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party, in responding to a pleading, may file a Motion to raise the defense of "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) Motion, the Court must take all the well-pleaded facts in the Complaint and view them in the light most favorable to the Plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). The Complaint must contain sufficient information to provide the elements of the claim or to permit inferences to be drawn as though those elements exist. *Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993). The Court should not assume, however, that the Plaintiff can prove fact that he has not alleged. *Associated Gen'l Contractors of California v. California State Council of Carpenters*, 559 U.S. 519, 526 (1993). If "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," then the Complaint should be dismissed. *Hison v. King & Spalding*, 467 U.S. 69, 73 (1994).

Here, the Complaint fails to state a *Monell* claim and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. **Plaintiff cannot maintain a *Monell* claim against Wetzel and Harry**.

In Count II of the Complaint, Plaintiff purports to state a *Monell* claim against Defendants Wetzel and Harry. A *Monell* claim is not available against the

3

Commonwealth or its officials, however. Moreover, Plaintiff otherwise has failed to state an actionable supervisory claim against Wetzel and Harry.

Under Section 1983, supervisors cannot be held liable under the theory of *respondeat superior*. There is an exception to this rule with regard to municipalities. As recently reiterated by the Middle District, "a limited exception to the personal-involvement requirement is reflected in the holding of *Monell*, where the Supreme Court held 'that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies.'" *Diorio v. Harry*, 2020 WL 1140307, at *5 (M.D. Pa. Mar. 9, 2020) (citing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978)). Under *Monell*, a municipality may be held liable when the execution of a policy or custom of such municipality or corporation "inflicts the injury" for which the plaintiff seeks redress." *Id.* Importantly, however, "[t]he holding in *Monell* [] is restricted to municipalities and local government units and *does not* extend to states, entities considered arms of the state, nor state officials in their official capacity." *Id.*(emphasis added); *see also Snider v. Alvarez*, 2020 WL 6395499, at *23 (M.D. Pa. Nov. 2, 2020) ("Under a *Monell* theory of liability, a municipality is only liable under § 1983 for constitutional violations that are caused by its official policies and customs. The Commonwealth of Pennsylvania, however, is immune from liability.") (citing *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310, n.10 (3d

4

Cir. 2020) (liability under *Monell* is limited to municipalities) (citing *Monell*, 436 U.S. at 690 n.54)). Because this matter does not involve municipal liability, Plaintiff's *Monell* claim fails as a matter of law.

Plaintiff has not otherwise stated a claim for supervisory liability. Plaintiff does not plead any specific actions taken by Wetzel or Harry, or what exactly they should have done differently, "whether with respect to specific training programs or other matters, that would have prevented the unconstitutional conduct." *Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 75 (3d Cir. 2011). No specific facts about deficiencies are pled, at all. Rather, Plaintiff points to a settled lawsuit from 2013 and statistics regarding suicides, drawing the implication from the number of suicides that there must be a policy or training deficiency warranting supervisory liability—but never identifying a particular deficiency common to all cases.

Plaintiff states that the Disability Rights Network filed a lawsuit in 2013, the same year that the Department of Justice conducted an investigation into SCI-Cresson (which is closed). Doc. 1, ¶¶ 23-29. Further, Plaintiff claims that there has been an uptick in the number of suicide in the four years preceding Mr. Ingle's suicide, and that there were two other suicides at SCI-Camp Hill in the same year as Mr. Ingle's suicide (without context of prior numbers). *See* Doc. 1, ¶¶ 31-37. Plaintiff alleges that Wetzel "vowed to change [his] ways and for a time, it appeared that steps had been taken to improve conditions for inmates with serious

mental illnesses and lower suicide rates within the state prisons." Doc. 1, ¶ 29. But, Plaintiff concludes that "any such measures that were implemented were ineffective and did not last." Doc. 1, ¶ 30.

At no point, however, does Plaintiff identify any one specific measure that was implemented that was ineffective and did not last. Nor does Plaintiff proffer a deficiency in current policy.[1] Plaintiff does not plead any particular knowledge on the part of Secretary Wetzel of any ongoing policy problem. Plaintiff does not allege that they adopted policies that led to harm. The claim is based upon numbers alone, and there is no case law indicating that numbers alone are sufficient to state a constitutional claim for supervisory liability.

Rather, the law is clear that there must be actual knowledge of a discrete problem. "[I]n the absence of facts concerning specific actions by each of the supervisory defendants" a Section 1983 claim of individual supervisory liability is "conflate[ed]" with "one of municipal liability." *Gaymon v. Esposito*, 2013 WL 4446973, at *10 (D.N.J. Aug. 16, 2013)(citing *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543 (6th Cir.2008)). Plaintiff *must* allege that the supervisory defendants had "contemporaneous, personal knowledge" of precise policies that are not being followed. *See Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir.2005)

---

[1] Plaintiff does cite a portion of the DOC's Access to Mental Health Care Procedures Manual (13.8.1, Section 2), but with approval, claiming it was not followed in this case.

(dismissing supervisory liability claim against individual government defendant where the operative complaint "did not allege any facts indicating that Attorney General Fisher personally directed her transfer [or that] .... Attorney General Fisher had contemporaneous, personal knowledge of her transfer and acquiesced in it."). Moreover, "[a]llegations of participation or actual knowledge and acquiescence ... must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Here, no claim has been stated against Wetzel, because beyond raw data on the number of suicides, there are no facts regarding what he did wrong specifically. The same goes for the claim against Superintendent Harry. As to Harry, Plaintiff alleges that, "[i]n 2019 alone, and prior to Ingle's suicide, two other inmates at SCI-Camp Hill killed themselves by hanging in January and June 2019." Doc. 1, ¶ 33. Plaintiff states that, "[a]t the time of those suicides, and when Ingle ultimately hanged himself in his cell on December 4, 2019, Sup. Harry was the Superintendent of SCI-Camp Hill." Doc. 1, ¶ 34.

There are no other operative facts against Superintendent Harry. The fact that there were other suicides, alone, cannot give rise to constitutional liability, not only because the theory is unsupported by clearly established law, but also because there are no allegations that Harry knew of a particular policy issue that could have prevented the tragedies.

Plaintiff has failed to meet the burden of stating a supervisory claim in this case because there are no allegations stated with particularity, let alone allegations regarding contemporaneous knowledge of a discrete policy issue, giving rise to constitutional liability.

B.     **<u>Wetzel and Harry cannot be maintained as Defendants to Section 1983 claims due to lack of personal involvement</u>**.

Plaintiff must demonstrate personal involvement by Wetzel and Harry in the wrongdoing to maintain them as defendants to the constitutional claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). To survive a motion to dismiss, each defendant must be shown, through the complaint's allegations, to have played an affirmative part in the events or occurrences upon which Plaintiff's claims are based. *Rode*, 845 F.2d at 1207; *Rizzo v. Goode*, 423 U.S. 362 (1976). Vicarious liability is inapplicable to § 1983 suits; instead "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). Finally, it is insufficient to survive a motion to dismiss for a complaint to merely hypothesize about a defendant's personal involvement, nor is a court required to assume that the plaintiff can use the discovery process to prove facts not alleged. *Evancho v. Fisher*, 423 F.2d 347, 353-354 (3d Cir. 2005).

Here, as discussed, there are no facts implicating Wetzel and Harry in the underlying incident. There are no allegations that either defendant ever personally

8

interacted with Mr. Ingle or that they had personal knowledge of his circumstances, whatsoever. There are no allegations that they directed with individual defendants with respect to Mr. Ingle's care. The allegations against Wetzel and Harry amount only to *respondeat superior*. Thus, no Section 1983 claim can be maintained against these Defendants.

C. **<u>Wetzel and Harry are entitled to qualified immunity</u>**.

The applicability of qualified immunity is most appropriately resolved at the earliest possible stage—even the pre-answer procedural stage by way of a Rule 12(b)(6) motion to dismiss. *See Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 329-30 (3d Cir. 2014), *judgment rev'd sub nom. on other grounds*, *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) ("We have recognized that 'the determination of qualified immunity must be made at an early stage in the litigation' —often in a pre-answer motion to dismiss. We thus often analyze qualified immunity without the benefit of a factual record."); *see also Ball v. Famiglio*, 726 F.3d 448, 461 (3d Cir. 2013) ("…immunity could, like failure to exhaust, provide the basis of a dismissal pursuant to Rule 12(b)(6)) (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir.1998) (dismissing a complaint under Rule 12(b)(6) because "the complaint itself establishes the facts necessary to sustain defendant's immunity defense")). Indeed, the Supreme Court of the United States has

expressly, "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

The high Court has explained that, "the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Id.* The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* "Qualified immunity balances …the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* It applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S.Ct. 2894 (1978) (qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")). Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Id.*; *see also Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S. Ct. 834, 838 (1996) (describing qualified immunity, in part, as "an entitlement not to stand trial or face the other burdens of litigation").

"When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. Sept. 1, 2015); *see also Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) ("[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions"). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was ***clearly established*** at the time of the challenged conduct." *Taylor v. Barkes*, 135 S. Ct. 2042 (June 1, 2015) (emphasis added); *Spady*, 800 F.3d at 637 (stating that, in a qualified immunity analysis, Courts must engage in a two-prong analysis of "whether the facts that a plaintiff has shown make out a violation of a constitutional right," and "whether the right at issue was clearly established at the time of the defendant's misconduct").[2]

"Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law." *Spady*, 800 F.3d at 637 (citing *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019 (1994)). In order to demonstrate that a right is clearly established, plaintiffs must proffer persuasive

---

[2]     Courts routinely undertake to determine first whether the purported right at issue is clearly established, prior to determining if the constitutional right was violated. *See Spady, supra*.

caw law. And while "a case directly on point" is not required to demonstrate a clearly established right, "existing precedent must have placed the statutory or constitutional question ***beyond debate***." *Taylor*, 135 S. Ct. at 2044 (emphasis added). In other words, "[i]n order for a right to be clearly established there must be applicable precedent from the Supreme Court," or " 'a ***robust consensus of cases*** of persuasive authority' in the Court of Appeals…" *Spady*, 800 F.3d at 639 (emphasis added); *accord Estate of Burke v. Mahoney City*, 40 F. Supp. 2d 274, 283 (E.D. Pa. 1999; ("the Third Circuit has held that when there is a lack of substantially similar authority on point, the law cannot be said to be clearly established"); *Olschefski v. Red Lion Area Sch. Dist.,* 2012 WL 6003620, at *10 (M.D. Pa. Nov. 30, 2012) ("A plaintiff need not show a case directly on point, but may meet the burden by referencing closely analogous case law which demonstrates that the allegedly violated constitutional or statutory right was clearly established when the alleged violation took place.").

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor*, 135 S. Ct. at 2044. In determining whether the constitutional right at issue is clearly established, the Court "must first frame the precise contours of that right." *Spady*, 800 F.3d at 638. The Court is "not to define clearly established law at a high level of generality," rather; it "must define the right allegedly violated at

the appropriate level of specificity." *Id.* Stated otherwise, the Court is "required to frame the right … 'in a more particularized, and hence, more relevant, sense… in light of the case's specific context, not as a broad general proposition." *Id.*

For instance, in *Spady*, the Third Circuit similarly began its qualified immunity analysis on the "clearly established right" prong. In so doing, the Court noted that the plaintiff was seeking relief pursuant to the state-created-danger theory under the Fourteenth Amendment (one of two exceptions to the general rule that there is no affirmative right to governmental aid under the Fourteenth Amendment). *Spady, supra.* However, the Third Circuit did not simply apply the elements of the state-created-danger theory to the facts. *Id.* Instead, it framed the right in a more specific sense, looking for cases presenting analogous factual situations, ultimately ruling that "our jurisprudence has not recognized a state-created danger theory on these or similar facts," such that the purported right was not clearly established. *Id.* (holding that students do not have a clearly established right to intervention by gym teachers to prevent non-apparent dry drowning); *see also Michtavi v. Scism*, 2015 WL 6123501, at *2 (3d Cir. Oct. 19, 2015) (overruling the Middle District's denial of qualified immunity, in part because it "defined the right at issue as either the Eighth Amendment right to treatment of serious medical needs or the fundamental right to procreate, but both of those definitions are too broad.").

In this instance, there is no robust consensus of case law establishing supervisory liability in and of itself, let alone the theory based solely on the number and rate of suicides in an institution or system. And, existing binding authority indicates that there is not clearly established law as to supervisory responsibilities regarding suicide screenings. The Supreme Court overturned the Third Circuit on this score in *Taylor v. Barkes*, 575 U.S. 822 (2015). There, the Court stated:

> No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols. And "to the extent that a 'robust consensus of cases of persuasive authority' " in the Courts of Appeals "could itself clearly establish the federal right respondent alleges," *City and County of San Francisco v. Sheehan,* 575 U.S. ——, ——, 135 S.Ct. 1765, 1779, —— L.Ed.2d —— (2015), the weight of that authority at the time of Barkes's death suggested that such a right did *not* exist. See, *e.g., Comstock v. McCrary,* 273 F.3d 693, 702 (C.A.6 2001) ("the right to medical care for serious medical needs does not encompass the right to be screened correctly for suicidal tendencies" (internal quotation marks omitted)); *Tittle v. Jefferson Cty. Comm'n,* 10 F.3d 1535, 1540 (C.A.11 1994) (alleged "weaknesses in the [suicide] screening process, the training of deputies[,] and the supervision of prisoners" did not "amount to a showing of deliberate indifference toward the rights of prisoners"); *Burns v. Galveston,* 905 F.2d 100, 104 (C.A.5 1990) (rejecting the proposition that "the right of detainees to adequate medical care includes an absolute right to psychological screening"); *Belcher v. Oliver,* 898 F.2d 32, 34–35 (C.A.4 1990) ("The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies.").

*Taylor*, 575 U.S. at 825. The *Taylor* case is good law, and no opposite robust consensus has been established. Thus, because the Plaintiff cannot point to a robust consensus of case law establishing supervisory liability in this context, and particularly any case law establishing liability on numbers of suicides alone, they are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, this Honorable Court should grant the Defendants' Partial Motion to Dismiss, and dismiss the claims against Wetzel and Harry.

**Respectfully submitted,**

**JOSH SHAPIRO**
**Attorney General**

**By:** *s/ Nicole J. Boland*
**NICOLE J. BOLAND**
**Office of Attorney General** **Senior Deputy Attorney General**
**15th Floor, Strawberry Square** **Attorney ID 314061**
**Harrisburg, PA 17120**
**Phone: (717) 783-3146** **KAREN M. ROMANO**
**Chief Deputy Attorney General**
**nboland@attorneygeneral.gov** **Civil Litigation Section**

**Date: March 18, 2022** *Counsel for Defendants Wetzel,*
*Fletcher, Gerson, Harry and Wimer*

15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH A. MCQUAID, | : | |
| Plaintiff | : | No. 4:21-CV-2019 |
| | : | |
| v. | : | **Magistrate Judge Arbuckle** |
| | : | |
| JOHN WETZEL, LAUREL | : | **Electronically Filed Document** |
| HARRY, JOHN/JANE DOES 1-10, | : | |
| SERGEANT FLETCHER, | : | *Complaint Filed 12/01/21* |
| SPECIALIST KRISTIE GERSON, | : | |
| SPECIALIST ROBERT WIMER, | : | |
| NURSE PRACTITIONER KEVIN | : | |
| WANGA, DR. SAIQA MUSHTAQ, | : | |
| MD, MHM CORRECTIONAL | : | |
| SERVICES, LLC, CORRECT | : | |
| CARE SOLUTIONS, LLC *and* | : | |
| JOHN/JANE DOES 1-10, | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, Nicole J. Boland, Senior Deputy Attorney General for the Commonwealth

of Pennsylvania, Office of Attorney General, hereby certify that on March 18,

2022, I caused to be served a true and correct copy of the foregoing document to

the following:

<u>**VIA ECF**</u>

**Peter A. Greiner, Esquire**
**Zarwin Baum DeVito Kaplan Schaer**
    **& Toddy**
**2005 Market Street, 16th Floor**
**Philadelphia, PA 19103**
**pagreiner@zarwin.com**
*Counsel for Plaintiff*

**Cassidy L. Neal, Esquire**
**Matis Baum O'Connor, PC**
**912 Fort Duquesne Boulevard**
**Pittsburgh, PA 15222**
**cneal@mbo-pc.com**
*Counsel for Defendants Wanga,*
*Mushtaq and MHM Correctional*
*Services, LLC*

**Caitlin J. Goodrich, Esquire**
**Weber Gallagher Simpson Stampleton**
  **Fires & Newby, LLP**
**Four PPG Place, 5th Floor**
**Pittsburgh, PA  15222**
**cgoodrich@wglaw.com**
*Counsel for Defendant Correct Care*
*Solutions, LLC*

  *s/ Nicole J. Boland*
**NICOLE J. BOLAND**